UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                                   :
UNITED STATES OF AMERICA                                           :
                                                                   :          19 Cr. 832 (ER)
                                                                   :
                          – v. –                                   :
                                                                   :
LUIS MERCED,                                                       :
                                                                   :
                          Defendant.                               :
                                                                   :
------------------------------------------------------------------ X

## THE GOVERNMENT'S OPPOSITION TO DEFENDANT LUIS MERCED'S MOTION TO SUPPRESS

AUDREY STRAUSS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Andrew K. Chan
Adam Hobson
Assistant United States Attorneys
- Of Counsel -

# **Table of Contents**

I.      Preliminary Statement ........................................................................................... 1

II.     Factual Background ............................................................................................... 2

III.    Law Enforcement Officers Did Not Improperly Detain the Defendant ........................... 6

        A.      Applicable Law ......................................................................................... 6

        1.      Consensual Encounters with Law Enforcement ........................................ 6
        2.      Investigatory Stops ................................................................................ 7

        B.      Discussion ................................................................................................ 8

IV.     Law Enforcement Officers Conducted a Consensual Search of the Defendant and
        Would Have Inevitably Discovered the Currency ........................................................ 11

        A.      Applicable Law ......................................................................................... 12

        1.      Voluntary Consent ................................................................................ 12
        2.      Inevitable Discovery ............................................................................. 13

        B.      Discussion ................................................................................................ 13

        1.      The Defendant Provided Voluntary Consent for the Search ..................... 13
        2.      DEA Agents Would Have Inevitably Discovered the Currency ............... 16

V.      The Evidence Should Not Be Suppressed Under the Attenuation Doctrine ..................... 17

        A.      Applicable Law ......................................................................................... 17

        1.      The Exclusionary Rule ........................................................................... 17
        2.      The Attenuation Doctrine ...................................................................... 18
        3.      The Supreme Court's Decision in *Strieff* ................................................ 20

        B.      Discussion ................................................................................................ 20

VI.     An Evidentiary Hearing is Not Required .................................................................. 22

VII.    Conclusion ........................................................................................................... 24

# Table of Authorities

## Cases

*Alabama v. White*, 496 U.S. 325, 330 (1990) ............................................................... 8

*Arizona v. Eans*, 514 U.S. 1, 10 (1995) ..................................................................... 17

*Brown v. Illinois*, 422 U.S. 590, 609 (1975) ......................................................... 19, 20

*Florida v. Bostick*, 501 U.S. 429, 434 (1991) ............................................................ 6

*Florida v. Harris*, 568 U.S. 237, 249-50 (2013) ....................................................... 17

*Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984) ............................................................ 7

*Florida v. Royer*, 460 U.S. 491, 497 (1983) ............................................................... 9

*Galarza v. Monti*, 327 F. Supp. 3d 594, 603 (S.D.N.Y. 2018) ................................... 21

*Grant* v. *United States*, 282 F.2d 165, 170 (2d Cir. 1960) ........................................ 22

*Henry v. Tracy*, 629 F. App'x 26, 28-29 (2d Cir. 2015) ............................................. 14

*Herring v. United States*, 555 U.S. 135, 139 (2009) ............................................. 17, 18

*Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ................................................... 19, 22

*Illinois v. Caballes*, 543 U.S. 405, 409 (2005) ......................................................... 16

*Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ........................................................... 8

*In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 102 (2d Cir. 2016) .............. 13

*In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 165 (2d Cir. 2008) .. 22

*Kaupp v. Texas*, 538 U.S. 626, 629 (2003) ................................................................. 7

*Kee v. United States*, 2001 WL 1464733, at \*2 (S.D.N.Y. Nov. 16, 2001) ................... 22

*Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006) ............................................. 19

*Murray v. United States*, 487 U.S. 533, 537 (1988). ................................................. 18

*Nardone v. United States*, 308 U.S. 338, 341 (1939) ................................................. 18

*Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) ................................................ 8

*Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1972) .............................................. 12

*Terry v. Ohio*, 392 U.S. 1, 27-28 (1968) .............................................................. 8, 11

*United States* v. *Ansaldi*, 372 F.3d at 129 .............................................................. 15

*United States* v. *Arango-Correa*, 851 F.2d 54, 56-58 (2d Cir. 1988) ......................... 15

*United States v. Arvizu*, 534 U.S. 266, 267 (2002) ...................................................... 8

*United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) ......................................... 8

*United States v. Bazemore*, 2021 WL 1719233, at *3 (S.D.N.Y. Apr. 30, 2021) ...................... 22

*United States v. Bellamy*, 592 F. Supp. 2d 308, 318-19 (E.D.N.Y. 2009)................................... 11

*United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) ............................................ 14

*United States v. Camacho*, 2005 WL 1594257, at *4 (E.D.N.Y. July 5, 2005) .......................... 11

*United States v. Carranza*, 2009 WL 536513, at *1 (S.D.N.Y. Mar. 4, 2009)........................... 23

*United States v. Ceballos*, 812 F.2d 42, 51 (2d Cir. 1987)................................................... 15

*United States v. Cortez¸* 449 U.S. 411, 417 (1981)............................................................ 8

*United States v. Crews*, 445 U.S. 463, 470 (1980) ........................................................... 18

*United States v. Dewar*, 489 F. Supp. 2d 351, 359 (S.D.N.Y. 2007) ......................................... 22

*United States v. Eggers*, 21 F. Supp. 2d 261, 269 (S.D.N.Y. 1998) ......................................... 14

*United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) ................................................. 12

*United States v. Feliciano*, 1995 WL 710199, at *2 (S.D.N.Y. Dec. 4, 1995)............................. 14

*United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) .......................................... 12, 15

*United States v. Getto*, 729 F.3d 221, 226 n.6 (2d Cir. 2013) ........................................... 22

*United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) ................................................ 7, 9

*United States v. Gray*, 283 F. App'x 871, 873 (2d Cir. 2008) ............................................. 15

*United States v. Hayes*, 551 F.3d 138, 144 (2d Cir. 2008) ................................................. 16

*United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006)................................................... 13

*United States v. Hooper*, 935 F.2d 484, 491-92 (2d Cir. 1991)............................................ 9

*United States v. Jacobsen*, 466 U.S. 109, 124 (1984)...................................................... 16

*United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990)................................................... 7

*United States v. Leon*, 468 U.S. 897, 906 (1984)........................................................... 18

*United States v. Mendenhall*, 446 U.S. 544, 551-57 (1980) ............................................... 6

*United States v. Moreno*, 701 F.3d 64, 72 (2d Cir. 2012)......................................... 12, 15

*United States v. Patrick*, 842 F.3d 540, 542 (7th Cir. 2016) ........................................... 21

*United States v. Penalo*, 516 F. Supp. 1042, 1046 (E.D.N.Y. 1981)........................................ 11

*United States v. Perryman*, 2013 WL 4039374, at *6 (E.D.N.Y. Aug. 7, 2013)........................ 22

*United States v. Place*, 462 U.S. 696, 702 (1983) ................................................. 8, 16

*United States v. Price*, 599 F.2d 494, 504 (2d Cir. 1979)................................................. 12

*United States v. Puglisi*, 790 F.2d at 243-44 .............................................................. 15

*United States v. Pulvano*, 629 F.2d 1151, 1157 (5th Cir. 1980)........................................... 14

*United States v. Simmons*, 560 F.3d 98, 105-06 (2d Cir. 2009)........................................ 7

*United States v. Singh*, 2012 WL 2501032 (E.D.N.Y. Jun. 27, 2012)........................................ 23

*United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006)........................................ 12

*United States v. Sokolow*, 490 U.S. 1, 7 (1989) ........................................ 8, 11

*United States v. Stevens*, 1992 WL 175272, at *2 (S.D.N.Y. July 16, 1992) ........................................ 23

*United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995)........................................ 8

*United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004)........................................ 7

*United States v. Velez-Lopez*, 595 App'x 81, 82 (2d Cir. 2015)........................................ 6

*United States v. Vilar*, 729 F.3d 62, 84 (2d Cir. 2013) ........................................ 13

*United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989)........................................ 22

*United States v. Zuniga*, 860 F.3d 276, 283 (5th Cir. 2017) ........................................ 21

*Utah v. Strieff*, 136 S. Ct. 2056, 2063 (2016) ........................................ passim

*Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)........................................ 18, 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X
                                           :

UNITED STATES OF AMERICA              :
                                           :      19 Cr. 832 (ER)

                 – v. –              :
                                           :

LUIS MERCED,                          :
                                         :

                 Defendant.       :
--------------------------------------------------------------------- X

### THE GOVERNMENT'S OPPOSITION TO DEFENDANT LUIS MERCED's MOTION TO SUPPRESS

## I.      Preliminary Statement

      The Government respectfully submits this memorandum of law in opposition to Defendant Luis Merced's motion to suppress evidence and statements from a seizure of approximately $23,500 in United States currency from the defendant by Drug Enforcement Administration ("DEA") agents at the Washington National Airport in Washington, D.C. on March 9, 1989.   For the following reasons, the Court should deny the defendant's motion to suppress as a matter of law without a hearing:

      *First*, law enforcement officers did not conduct an illegal stop or search of the defendant. Rather, law enforcement officers lawfully approached the defendant at the airport and asked him questions.  The defendant then provided voluntary consent for a search of his person.  In any event, law enforcement officers also had reasonable suspicion to conduct a brief investigatory stop of the defendant and to expose the defendant to a trained narcotics detection canine, which would have inevitably resulted in the discovery of the currency.  As a result, the defendant's motion to suppress fails on the merits.

*Second*, the exclusionary rule should not even apply here because any unlawful search or seizure of the defendant by law enforcement officers was sufficiently attenuated by a pre-existing arrest warrant issued by the Kings County Supreme Court on July 6, 1987, which was still active on the date of the currency seizure in March 1989.  In 2016, the Supreme Court held that suppression of evidence should not be granted in similar circumstances, even assuming that law enforcement officers conducted an unlawful stop.  *See Utah v. Strieff*, 136 S. Ct. 2056, 2063 (2016) (holding that evidence discovered was admissible because "the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant").

## II.    Factual Background

On March 9, 1989, at approximately 2:50 p.m.—approximately one month after the murder of Efren Cardenas on February 10, 1989—DEA agents assigned to the Washington National Airport observed Defendant Luis Merced purchase airline tickets at the Pan American ticket counter.[1]  The defendant then met up with another individual who later provided the name "Shawn White" to law enforcement.  DEA agents observed that the defendant and White were both wearing very large winter coats while walking through the indoor airport terminal.  In particular, White was wearing an extremely large winter coat reaching his knees, which appeared to be many sizes too large for him.  Additionally, the defendant and White did not have any bags or luggage, yet were proceeding through security towards the Pan American departure and arrival gates.  Even though the defendant and White had been seen speaking together, they also walked towards

---

[1] The Government incorporates by reference the factual background from its opposition to the other pretrial motions filed by the defendants, which was filed on April 30, 2021.  (Docket No. 54).

2

security separately, with White keeping approximately fifteen feet behind the defendant.  *See* Report of Investigation, attached hereto as Exhibit A, at ¶ 1.

DEA agents then approached the defendant and White in the waiting room area for Pan American airlines, identified themselves as law enforcement, and asked to speak to them.  The defendant replied: "Yeah."  The defendant and White confirmed that they were flying to New York City that day.  The agents also asked to see the defendant and White's airline tickets, and the defendant provided both airline tickets to the agents.  *See* Copies of Airline Tickets, attached hereto as Exhibit B.  The airline tickets were in the names of the defendant and White and were one-way shuttle tickets between Washington D.C. and New York City, which were paid for in cash and not linked to any particular flight number that day.  *See* Exhibit B.  The agents asked the defendant why he had both tickets, and the defendant replied that he had paid for both of them in cash.  The agents also asked the defendant how old he was, and the defendant replied that he was 17 years old.  The agents returned the airline tickets and asked to see the defendant and White's identification.  The defendant produced an Adult Continuing Identification Card, but White was unable to produce any identification.  The agents also asked the defendant how long he had been visiting Washington D.C., and the defendant replied that the visit was approximately a week.  When asked why he did not have any luggage for a one-week trip, the defendant shrugged his shoulders upward.  During the entire conversation, the defendant would not look directly at the agents when answering questions.  Exhibit A at ¶ 2.

The agents then identified themselves as DEA agents and asked the defendant and White for consent to search their persons.  The defendant immediately stated "No!"  When asked why not, the defendant responded that he did not have any drugs and "knew his rights".  The agents then asked for consent for a a trained narcotics detection canine to sniff their persons.  The

defendant replied, "Sure, c'mon," and began walking down the stairs, followed by White, towards the concourse.  As they were walking, the agents stated that they would contact the canine's handler at the airport police station near Eastern Airlines.  The defendant then stopped and stated that he needed to get on the plane immediately.  The agents indicated that the defendant would be able to save time by consenting to a search of his person.  The defendant stated, "I know my rights." While the agents were speaking to the defendant, White consented to a search of his person, which did not reveal any contraband.  White then began walking back towards the Pan American departure gates and stated to the defendant: "[G]o ahead and let him search you so we can get on the plane."  At this point, the defendant held his arms up and away from his body and said "Okay." *See* Exhibit A at ¶ 3.

The agents searched the defendant's jacket and found a large sum of United States currency in each of the defendant's front pockets.  The agents asked the defendant how much he had, and the defendant responded "About $5,000.00."  The agents then told the defendant that he was being detained in order to be questioned about the money.  The defendant was escorted to the airport police station, while White continued towards the Pan American departure and arrival gates.  *See* Exhibit A at ¶ 3.  Once at the airport police station, the agents patted down the defendant again and felt a large lump in an inside coat pocket.  The agents asked the defendant what the lump was, and the defendant replied, "More money."  The agents then continued their search of the defendant and found even more money inside the waistband of the defendant's pants wrapped around the defendant's stomach, all hidden underneath a sweatshirt and the large winter coat.  The agents again asked the defendant how much money he had, and the defendant responded, "About $18,000.00."  *See* Exhibit A at ¶ 4.

The agents advised the defendant that he was not under arrest, but they wanted to ask him some questions about the money, and the defendant agreed.  The defendant made statements about, among other things, why he had visited Washington D.C., where he had stayed during his trip, car dealerships that the defendant had visited in Washington D.C, the defendant's employment history, the origin of the money, and why the defendant had stayed in the Washington D.C. area for a week and did not have any luggage.  *See* Exhibit A at ¶¶ 4-9.

The agents also ran a criminal history check of the defendant and identified that an arrest warrant for the defendant had been issued on July 16, 1987 by the Kings County Supreme Court after the defendant failed to appear in court relating to a May 27, 1987 arrest for the sale of dangerous drugs.  *See* Exhibit A at ¶ 10.  The defendant admitted that he had been arrested previously on narcotics charges.  The agents then placed the defendant under arrest based on the ousttanding fugitive warrant.  A narcotics detection canine was also brought to the airport police station, which reacted positively to the presence of cocaine on the currency.  *See* Exhibit A at ¶ 10.  In total, the agents seized approximately $23,500 in currency from the defendant.  The agents then contacted law enforcement officers in New York, who responded that the warrant was still outstanding, but the District Attorney's office had eletected not to seek extradition from Washington D.C. to New York.  As a result, the defendant was released from custody on March 15, 1989.  *See* Exhibit A at ¶¶ 12-15.

On May 4, 2021, the defendant filed a motion to suppress statements and physical evidence relating to the DEA's actions on March 9, 1989.  (Docket No. 56).  Trial is currently scheduled to commence on December 6, 2021.

**III.    Law Enforcement Officers Did Not Improperly Detain the Defendant**

At the outset, the defendant argues that he was illegally stopped and detained by law enforcement officers in the Pan American waiting area.  (Docket No. 56 at 5-6).  But the DEA agents did not stop or detain the defendant at all during the initial stages of the encounter.  Rather, the agents simply approached the defendant in the waiting area, identified themselves as law enforcement, asked some questions, and requested to see photo identification—a permissible investigatory technique frequently used at airports by law enforcement.  In any event, the law enforcement officers quickly obtained reasonable suspicion to conduct an investigatory stop of the defendant during their conversation with him.

**A.    Applicable Law**

**1.    Consensual Encounters with Law Enforcement**

For Fourth Amendment purposes, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions."  *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  Rather, the Supreme Court has repeatedly held that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage— as long as the police do not convey a message that compliance with their requests is required." *Id.* (collecting cases); *see also United States v. Mendenhall*, 446 U.S. 544, 551-57 (1980) (agents were permitted to approach and question passenger walking through airport concourse); *United States v. Velez-Lopez*, 595 App'x 81, 82 (2d Cir. 2015) (summary order) ("It is well established that a police officer who merely asks a person questions in a public place has not thereby conducted a stop, since such questioning is 'clearly the sort of consensual encounter that

implicates no Fourth Amendment interest.'" (citing *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984)).

A police encounter becomes a seizure when, after "taking into account all of the circumstances surrounding the encounter," the "police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (internal citation omitted); *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) ("[A]n individual can be said to have been seized by the police only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (internal quotation marks and citation omitted)).  The Second Circuit has described the hallmarks of a "seizure" as "the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language and tone indicating that compliance with the officer was compulsory; prolonged retention of a personal person's effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room."  *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992); *see also United States v. Simmons*, 560 F.3d 98, 105-06 (2d Cir. 2009) (defendant seized when defendant obeyed the officer's command to stop); *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) ("When the police first approached Vargas, instead of using force, they merely asked to talk to him.  His freedom clearly was not restrained, considering the fact that he fled after the officers asked to speak to him.").

### 2.    Investigatory Stops

An officer who lacks the level of information necessary for an arrest may conduct a brief investigatory detention—commonly known as a *Terry* stop—if the officer has a "reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity."

*United States v. Place*, 462 U.S. 696, 702 (1983); *see also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Terry v. Ohio*, 392 U.S. 1, 27-28 (1968); *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014); *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) (distinguishing between consensual encounters, investigative stops, and arrests).  The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability."  *Alabama v. White*, 496 U.S. 325, 330 (1990).  This standard takes into account "the totality of the circumstances—the whole picture."  *United States v. Cortez*¸ 449 U.S. 411, 417 (1981); *see also United States v. Arvizu*, 534 U.S. 266, 267 (2002) (reviewing courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing).  Although a mere "hunch" does not create reasonable suspicion*, Terry* 392 U.S. at 27, the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause, *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Moreover, officers may "draw on their experiences and specialized training to make inferences from and deductions about the cumulative information available." *Arvizu*, 534 U.S. at 267 (internal citation omitted); *see also United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (explaining that courts may consider circumstances and rational inferences "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training").

 **B.**  **Discussion**

   Applying the principles set forth above, law enforcement officers did not conduct an unlawful stop of the defendant at the airport.  Rather, the DEA agents approached the defendant and White and asked them questions in the Pan American waiting room.  The DEA Report of

Investigation—which the defendant exclusively relies on as the basis for his motion—states that the DEA agents "approached MERCED and WHITE, verbally identifying themselves as police officers, presented their badges and credentials and asked to speak to them.  MERCED replied, 'Yeah.'"  The DEA agents then asked the defendant and White several questions and asked to see their identification.  *See* Exhibit A at ¶ 2.  It is well-established that this type of law enforcement conduct—approaching people in public places and asking them questions—is permissible under the Fourth Amendment.  *See Florida v. Royer*, 460 U.S. 491, 497 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions . . . Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification."); *United States v. Hooper*, 935 F.2d 484, 491-92 (2d Cir. 1991) (collecting cases); *Glover*, 957 F.2d at 1009 (finding no seizure where agent "approached Glover in a public place, identified himself as a police officer, and, in a non-threatening manner, asked Glover certain questions, requested identification, and asked whether Glover would consent to have his bags searched for narcotics.  No weapons were displayed and there was no physical contact between the officers and Glover.").

Nor is there any evidence that the agents signaled to the defendant or to White that they were being detained or otherwise were not free to leave.  There is no evidence in the record that the agents displayed weapons, touched the defendant, instructed them to go to a police station, or otherwise indicated that they were being detained or under arrest.  *See Glover*, 957 F.2d at 1008 (describing the "hallmarks" of a seizure).  Indeed, the defendant himself later decided that he

was unwilling to follow the law enforcement agents all the way to the airport police station near

Eastern Airlines and expressed a desire to go back to the Pan American departure gates. *See*

Exhibit A at ¶ 3 ("As they began to proceed down the concourse, S/A Yates advised MERCED

that he would contact the narcotic dog handler at the Metropolitan Washington Airport Authority

(MWAA) Police Station near Eastern Airlines.  MERCED stopped and advised S/A Yates that

he needed to get on the plane immediately.").  Based on this record, the agents did not violate the

Fourth Amendment by deciding to approach Merced and White and ask them questions.

To the extent that the defendant suggests that the encounter became a seizure when the

DEA agents responded to the defendant's request to leave with the suggestion that he could

"save time" by consenting to a search instead of walking to the airport police station for exposure

to the narcotics detection canine, *see* Exhibit A at ¶ 3, this argument also fails because the agents

had reasonable suspicion at this point to conduct an investigatory stop of the defendant and to

use a narcotics detection canine.  By this point in the encounter, law enforcement agents had

observed, among other things: (1) the defendant and White were wearing unusually large winter

jackets and carrying no bags, backpacks, or luggage while walking towards the departure gates;

(2) the defendant bought two airline tickets—including a ticket for another person who had no

photo identification—with cash; (3) the defendant was only 17 years old but possessed enough

cash to purchase two airline tickets; (4) the defendant had purchased White's ticket, but the two

men made a point of keeping distances from one another as they approached security; (5) the

defendant had no explanation for why he had no luggage during a one-week visit to Washington

D.C.; (6) the defendant would not look directly at agents during the conversation; and (7) White

possessed no identification matching the name on the airline ticket. *See* Exhibit A at ¶ 2.  This

constellation of facts directly comports with other cases where courts have found reasonable

suspicion for law enforcement agents to briefly detain a suspected drug or money courier at the airport.  *See Sokolow*, 490 U.S. at 3 (suspect paid for airline tickets with cash, traveled under an alias, traveled from a source city for drugs for a short period of time, appeared nervous, and did not check any luggage); *United States v. Bellamy*, 592 F. Supp. 2d 308, 318-19 (E.D.N.Y. 2009) (collecting cases); *United States v. Camacho*, 2005 WL 1594257, at *4 (E.D.N.Y. July 5, 2005) ("Further, even if the agents did not have reasonable suspicion initially, the agents quickly gained it through the defendant's evasive answers to the agents' lawful inquiries about the purpose of his presence at the airport and the identification of his aunt and uncle." (quotation marks omitted)); *United States v. Penalo*, 516 F. Supp. 1042, 1046 (E.D.N.Y. 1981) (suspects arrived from source city for drugs, looked around the airport to observe followers, made no sign of recognition, used a payphone without depositing money, and picked up a suitcase using a handkerchief); *see also Terry*, 392 U.S. at 23 (finding reasonable suspicion where suspects repeatedly looked into store windows and spoke to each other, causing law enforcement to briefly detain the suspects to investigate potential criminal activity further).

## IV.    Law Enforcement Officers Conducted a Consensual Search of the Defendant and Would Have Inevitably Discovered the Currency

The defendant next argues that he did not provide voluntary consent for a search of his person.  But this argument fares no better than the last.  Rather, the record amply demonstrates that the defendant knowingly and voluntarily consented to a search of his person.  In any event, the DEA agents would have inevitably discovered the currency, especially given that a trained narcotics canine later alerted to the presence of cocaine on the currency that was seized.

### A.    Applicable Law

#### 1.    Voluntary Consent

It is well established that a warrantless search does not violate the Fourth Amendment if "the authorities have obtained the voluntary consent of a person authorized to grant such consent." *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1972); *United States v. Price*, 599 F.2d 494, 504 (2d Cir. 1979) (explaining that "suspects can, and often do, voluntarily consent to a search even it must be clear to them that incriminating evidence will be disclosed"). Consent must be voluntary and therefore cannot "be coerced, by explicit or implicit means, by implied threat or covert force." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006); *see also United States v. Moreno*, 701 F.3d 64, 72 (2d Cir. 2012); *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). There is no requirement that the defendant be informed of his right to refuse consent. *See Schneckloth*, 412 U.S. at 227 ("while knowledge of the right to refuse consent is one factor to be taken into account in determining voluntariness, the Government need not establish such knowledge as the *sine qua non* of an effective consent"); *see also United States v. Moreno*, 701 F.3d at 77 (same); *United States v. Garcia*, 56 F.3d at 422-23 (same). Nor does the fact that a defendant is in custody—even in handcuffs—preclude a finding of voluntariness. *See Moreno*, 701 F.3d at 77 ("We have repeatedly observed that neither the fact that a person is in custody nor that she has been subjected to a display of force rules out a finding of voluntariness."). Rather, the sole relevant question with respect to the voluntariness of consent to search is "whether a defendant's will was overborne" by law enforcement. *Schneckloth*, 412 U.S. at 225-26. This is a fact-based inquiry into the "totality of all the circumstances." *Id.* at 27. "The government has the burden of proving, by a preponderance

of the evidence, that a consent to search was voluntary." *United States v. Isiofa*, 370 F.3d 226, 230 (2d Cir. 2004) (citing *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983)).

### 2.   Inevitable Discovery

Evidence seized in the course of a search that violates the Fourth Amendment "should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Vilar*, 729 F.3d 62, 84 (2d Cir. 2013) (internal quotation marks omitted). To show that the inevitable discovery exception applies, the Government must prove by a preponderance of the evidence that each event leading to the discovery of the evidence would have occurred, such that the district judge can conclude that the evidence would inevitably have been discovered. *In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 102 (2d Cir. 2016) (quoting *Vilar*, 729 F.3d at 84). The exception applies when the Government establishes with a "high level of confidence" that the "specific evidence in question would have been obtained by lawful means." *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006). The exception requires the district court to "determine, viewing affairs as they existed at the instant before the unlawful search" and make particularized findings as to "what would have happened had the unlawful search never occurred." *In re 650 Fifth Ave. & Related Properties*, 830 F.3d at 103-04.

### B.   Discussion

### 1.   The Defendant Provided Voluntary Consent for the Search

Applying the standards for voluntariness set forth above, there is no question that the defendant voluntarily consented to a search of his person. The defendant points out that he initially refused to consent to a search by the DEA agents. *See* Docket No. 56 at 6; Exhibit A at ¶ 3. But this is only one factor to be considered, given that the defendant later changed his mind and

consented to the search.  *See United States v. Feliciano*, 1995 WL 710199, at *2 (S.D.N.Y. Dec. 4, 1995) ("If a suspect initially refuses to give consent to a search and later changes his mind, his initial refusal is a factor to be considered in evaluating the voluntariness of his consent, but it is not determinative." (citing *United States v. Pulvano*, 629 F.2d 1151, 1157 (5th Cir. 1980)); *United States v. Eggers*, 21 F. Supp. 2d 261, 269 (S.D.N.Y. 1998) (describing a previous refusal to consent as a factor in determining voluntariness).  The defendant's prior refusal to consent also clearly demonstrates his awareness that he had an unambiguous right to refuse to consent to the search. *See* Exhibit A at ¶ 3 ("I know my rights.").  Additionally, there is no evidence that the defendant at this point had been placed in handcuffs, was threatened with force or arrest if he did not consent to the search, or otherwise consented to the search because of undue pressure placed on the defendant by the DEA agents.  Indeed, when the DEA agents suggested that the defendant could "save time" by consenting to a search instead of walking to the airport police station for the canine sniff, the defendant again refused to provide consent.  *See United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) ("[A]dvising a person of the fact that a search warrant can be obtained does not constitute coercion."); *Henry v. Tracy*, 629 F. App'x 26, 28-29 (2d Cir. 2015) ("We have repeatedly held . . . that it is not impermissibly coercive for officers to represent that, if consent is not given, a search warrant could be obtained, in contexts like the one before us in which the obtainability of a search warrant is in fact likely." (collecting cases)).  It was only after DEA agents searched White, and White encouraged the defendant to consent that the defendant changed his mind.  *See* Exhibit A at ¶ 3.  As a result, there is no evidence in the record suggesting that the defendant consented to the search because of law enforcement coercion or pressure.  At most, it appears that the defendant changed his mind after being persuaded by *White*—not a DEA agent—

that it would be easier to consent to a search instead of walking over to the airport police station for a canine sniff.

Courts have found voluntary consent in circumstances that were significantly more intimidating than those present here.  *See*, *e.g.*, *Moreno*, 701 F.3d at 76-78 (finding no clear error in decision that consent was voluntary after forcible entry into a motel room by armed agents who both subdued and handcuffed the defendant and who failed to inform the defendant of the right not to consent);  *United States* v. *Gray*, 283 F. App'x 871, 873 (2d Cir. 2008) (upholding finding of voluntary consent, despite the presence of multiple agents and the fact that agents had broken a glass window while knocking on it, which agents then used to gain access to a common hallway); *United States* v. *Ansaldi*, 372 F.3d at 129 (defendant was arrested and handcuffed by five or six officers with guns drawn); *United States* v. *Arango-Correa*, 851 F.2d 54, 56-58 (2d Cir. 1988) (defendant was arrested, detained, strip-searched, and questioned for five hours prior to giving consent); *United States* v. *Ceballos*, 812 F.2d 42, 51 (2d Cir. 1987) (defendant forcibly arrested and questioned for several hours, and officers had threatened to disrupt his home if he did not cooperate with them); *United States* v. *Puglisi*, 790 F.2d at 243-44 (defendant was frisked and arrested by agents with weapons drawn); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) ("Consent to a search has been found despite formal arrest, and such additional aggravating circumstances as handcuffing of a suspect, the presence of six law enforcement officers in his home, and their assurance that they would remain indefinitely and secure a search warrant if consent were withheld." (internal citations omitted).  As a result, there is no evidence suggesting that the defendant's will was overborne by force or coercion by law enforcement.  Rather, the defendant was fully aware of his options and nonetheless chose to provide consent for law enforcement officers to search him.

### 2.    DEA Agents Would Have Inevitably Discovered the Currency

Even if the defendant did not provide voluntary consent for the search of his person—which he clearly did—suppression of the evidence is also not warranted here because it would have inevitably been discovered by law enforcement.  The DEA agents and the defendant were on their way to the airport police station so that a trained narcotics detection canine could sniff the defendant.  Although the DEA agents encouraged the defendant to "save time" by consenting to a search, the DEA agents also were prepared to use the narcotics detection canine instead—an investigative technique that they would have been justified in using without any Fourth Amendment implications.  *See United States v. Place*, 462 U.S. 696, 707 (1983) (holding that use of a narcotics detection canine does not constitute a "search" under the Fourth Amendment); *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) ("[T]he reason [a canine sniff at the airport does] not intrude upon any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items."); *United States v. Hayes*, 551 F.3d 138, 144 (2d Cir. 2008) ("Both the Supreme Court and this Court have held that canine sniffs are recognized as being less intrusive than a typical search used to determine the presence of contraband, and the practice of using trained dogs to sniff baggage at airports has been held not to constitute a search." (collecting cases)); *see also Glover*, 957 F.2d at 1013 ("[D]etaining Glover for approximately thirty minutes with his bags to conduct brief questioning and to await the arrival of the narcotics dog was a limited intrusion on Glover's Fourth Amendment interests wholly justified by reasonable suspicion." (collecting cases)).  The record also clearly reflects what would have happened when the trained narcotics detection canine was exposed to the defendant—the dog would have alerted law enforcement to the odor of cocaine on the currency inside of the defendant's pockets and waistband.  *See* Exhibit A at ¶ 10.  The positive alert by the trained

narcotics detection canine, in addition to all of the other observations by the DEA agents up to that point, would have provided ample probable cause to search the defendant, arrest the defendant (and conduct a search incident to arrest), or both.  *See Florida v. Harris*, 568 U.S. 237, 249-50 (2013) (trained narcotics detection canine's positive alert generally provides probable cause).  For these reasons, the Court should also find that the DEA agents would have inevitably discovered the currency seized from the defendant.

## V.      The Evidence Should Not Be Suppressed Under the Attenuation Doctrine

Finally, even if the DEA agents wrongly stopped or searched the defendant—which they did not—the defendant's motion to suppress also fails as a matter of law because the defendant was the subject of a pre-existing arrest warrant on the date of the DEA's seizure of the currency on March 9, 1989.  The Supreme Court recently held in *Utah v. Strieff*, 136 S. Ct. 2056 (2016) that an unconstitutional investigatory stop does not necessarily require the suppression of incriminating evidence discovered during a subsequent search when the discovery of an arrest warrant "attenuated the connection between the unlawful stop and the evidence seized incident to arrest." *Id.* at 2059.  Similarly, any motion to suppress based on the notion that the DEA agents here acted improperly by stopping the defendant—when he was the subject of a court-issued fugitive arrest warrant—fails as a matter of law under the attenuation doctrine.

### A.      Applicable Law

#### 1.      The Exclusionary Rule

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. While the Fourth Amendment does not expressly preclude the use of "evidence obtained in violation of its commands," *Arizona v. Eans*, 514 U.S. 1, 10 (1995), Supreme Court decisions have

17

"establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). The Supreme Court "has never . . . interpreted" the exclusionary rule as "proscrib[ing] the introduction of illegally seized evidence in all proceedings or against all person." *United States v. Leon*, 468 U.S. 897, 906 (1984). Rather, the "exclusionary rule is not an individual right, and applies only where it 'results in appreciable deterrence.'" *Herring*, 555 U.S. at 135, 139-41 (quoting *Leon*, 468 U.S. at 909). Further, the Supreme Court has underscored that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred." *Murray v. United States*, 487 U.S. 533, 537 (1988).

The exclusionary rule applies to evidence directly and indirectly obtained as a result of an unlawful search. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). Thus, under the "fruit of the poisonous tree" doctrine, "the exclusionary sanction applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470 (1980) (footnotes omitted).

### 2.    The Attenuation Doctrine

The attenuation doctrine is one of several well-established exceptions to the exclusionary rule. Under the attenuation exception, a mere causal relationship between information gained during an illegal search and subsequently obtained evidence does not require automatic exclusion of the evidence because "such connection may have become so attenuated as to dissipate the taint."

*Nardone v. United States*, 308 U.S. 338, 341 (1939). The attenuation doctrine applies where an arrest or search involved a Fourth Amendment violation, but the connection between the illegal conduct and the subsequent discovery of evidence "become[s] so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown v. Illinois*, 422 U.S. 590, 609 (1975); *Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006) ("The attenuation doctrine allows introduction of evidence obtained after an unlawful arrest when 'the causal link' between a Fourth Amendment violation and a subsequent confession, identification or other form of evidence is 'so long or tortuous that suppression of the evidence is unlikely to have the effect of deterring future violations of the same type.'" (quotation marks omitted)).

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Strieff*, 136 S. Ct. at 2061. In considering whether exclusion of evidence is proper, courts do not simply inquire whether the evidence would have been discovered "but for" the illegal conduct. *See Wong Sun*, 371 U.S. at 487-88 ("We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police."); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("But-for causality is only a necessary, not a sufficient cause for suppression" and "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence."). Rather, "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun*, 371 U.S. at 487-88 (quotation marks omitted).

The Supreme Court has identified three factors for courts to consider when considering attenuation: (1) the amount of time between the illegality and the discovery of the evidence, i.e., temporal proximity; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the illegal conduct. *See Brown*, 422 U.S. at 603-04. The Government bears the burden of proving attenuation by a preponderance of the evidence. *See Strieff*, 136 S. Ct. at 2061-62.

### 3.  The Supreme Court's Decision in *Strieff*

In *Strieff*, the Supreme Court applied the three-factor test described in *Brown* to a situation where law enforcement officers conducted an unlawful traffic stop, but then discovered that the driver of the vehicle had an active arrest warrant. 136 S. Ct. at 2060. Law enforcement officers arrested the driver and discovered drugs and drug paraphernalia during a search incident to arrest. *Id.* The Court found that the first factor—temporal proximity—weighed in favor of suppression because of the short amount of time between the unlawful traffic stop and the discovery of the evidence. *Id.* at 2062. The second factor—the presence of intervening circumstances—strongly favored law enforcement because of the existence of a valid, pre-existing warrant that was entirely unconnected to the traffic stop, which required law enforcement officers to make an arrest, which also allowed law enforcement to conduct a search of the arrestee for their safety. *Id.* at 2062-63. Finally, the Court found that the alleged misconduct by law enforcement was not "purposeful or flagrant" but was at most a negligent decision to iniate a traffic stop, without any indication of "systemic or recurrent police misconduct." *Id.* at 2063. As a result, the Court applied the attenuation doctrine and ruled that the exclusionary rule did not apply.

### B.  Discussion

As in *Strieff*, the Court should find that the exclusionary rule should not apply here because any Fourth Amendment violations by the DEA agents are sufficiently attenuated from

20

the existence of the valid pre-existing warrant for the defendant's arrest.  This arrest warrant was

a judicial mandate ordering law enforcement officers to arrest the defendant, which would have

entitled the officers to conduct a search incident to arrest.  *Strieff*, 136 S. Ct. at 2062-63 ("Officer

Fackrell's arrest of Strieff thus was a ministerial act that was independently compelled by the

pre-existing warrant.  And once Officer Fackrell was authorized to arrest Strieff, it was

undisputedly lawful to search Strieff as an incident of his arrest to protect Officer Fackrell's

safety.").  Additionally, there is no evidence in the record that the DEA agents in this case

engaged in any purposeful or flagrant misconduct, aside from the allegation—which the

Government disputes—that they lacked reasonable suspicion to detain the defendant or

voluntary consent to search him.  *Id.* at 2064 ("For the violation to be flagrant, more severe

police misconduct is required than the mere absence of proper cause for the seizure.").

Numerous courts have similarly ruled that the presence of a pre-existing arrest warrant serves as

sufficient attenuation to mitigate the need to apply the exclusionary rule, even when the law

enforcement encounter began with an unlawful stop.  *See Galarza v. Monti*, 327 F. Supp. 3d 594,

603 (S.D.N.Y. 2018) ("[W]hatever the legality of the initial stop, Officer Monti had the right to

arrest the plaintiff based on the outstanding warrant and the existence of that valid warrant

attenuates the connection between an allegedly unlawful stop and a subsequent arrest." (citing

*Strieff*)); *United States v. Patrick*, 842 F.3d 540, 542 (7th Cir. 2016) ("*Strieff* tells us that, if the

police had stopped Patrick's car for no reason at all and learned only later that he was a wanted

man, the gun would have been admissible in evidence."); *United States v. Zuniga*, 860 F.3d 276,

283 (5th Cir. 2017) ("We note that even if we were to find a Fourth Amendment violation,

Zuniga's claim encounters yet another obstacle in that Officer Pruit's discovery of two

outstanding warrants for Zuniga may constitute a sufficient intervening event to break the causal

chain between the putatively unlawful stop and the subsequent discovery of drug-related evidence." (citing *Strieff*)).  As a result, the pre-existing arrest warrant for the defendant's arrest serves as a separate and independent reason why the defendant's motion to suppress should be denied as a matter of law.  *See Strieff*, 136 S. Ct. at 2061 ("Suppression of evidence . . . has always been our last resort, not our first impulse." (quoting *Hudson*, 547 U.S. at 591)).

## VI.    An Evidentiary Hearing is Not Required

"[E]videntiary hearings should not be set as a matter of course, but only when the petition alleges facts which if proved would require the grant of relief."  *Kee v. United States*, 2001 WL 1464733, at *2 (S.D.N.Y. Nov. 16, 2001) (quoting *Grant* v. *United States*, 282 F.2d 165, 170 (2d Cir. 1960)).  Indeed, a hearing is required only when the "moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question."  *United States* v. *Getto*, 729 F.3d 221, 226 n.6 (2d Cir. 2013) (quoting *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 165 (2d Cir. 2008)).

"This must be shown by an affidavit of someone with personal knowledge of the underlying facts which establish that disputed issues of material fact exist."  *United States v. Bazemore*, 2021 WL 1719233, at *3 (S.D.N.Y. Apr. 30, 2021) (ER) (quoting *United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989)); *United States v. Perryman*, 2013 WL 4039374, at *6 (E.D.N.Y. Aug. 7, 2013) ("Courts in this Circuit have 'repeatedly' denied motions to suppress without a hearing 'where defendants have failed to provide affidavits alleging facts based on personal knowledge.'" (collecting cases)).  "In the absence of such an affidavit, or when the allegations contained in such an affidavit are general and conclusory, an evidentiary hearing is unnecessary." *United States* v. *Dewar*, 489 F. Supp. 2d 351, 359 (S.D.N.Y. 2007); *see also*

*Bazemore*, 2021 WL 1719233, at \*3 ("An evidentiary hearing will not be required if the defendant's statements are general, conclusory or based on conjecture." (quotation marks and internal citations omitted)).

Because the defendant has not presented an affidavit in support of his motion to suppress, the Court should find that the facts in the DEA Report of Investigation are not in dispute.  Based on these undisputed facts, the Court can deny the defendant's motion to suppress as a matter of law without any additional fact-finding.  As described above, no suppression is warranted here because: (1) DEA agents lawfully approached the defendant at the Washington National Airport and asked him questions; (2) the defendant provided voluntary consent for a search of his person; (3) the DEA agents would have inevitably discovered the seized currency; and (4) the defendant was the named subject of a pre-existing arrest warrant.  S*ee United States v. Carranza*, 2009 WL 536513, at \*1 (S.D.N.Y. Mar. 4, 2009) (finding no hearing warranted where defendant does not contest the facts set forth in the sworn complaint and an additional declaration from a DEA agent); *United States v. Singh*, 2012 WL 2501032 (E.D.N.Y. Jun. 27, 2012), at \*2 (finding that information from sworn complaints was "sufficient to show that the search of Defendant and his arrest were lawful"); *United States v. Stevens*, 1992 WL 175272, at \*2 (S.D.N.Y. July 16, 1992) (finding no hearing warranted where defendant "has not put in issue any information set forth in the sworn complaint on which he was arraigned").  Without any declaration from the defendant disputing the facts set forth in the DEA Report of Investigation, the defendant's motion to suppress can be denied without an evidentiary hearing.

**VII.     Conclusion**

For the reasons set forth above, the Court should deny the defendant's motion to suppress

without a hearing.

Dated:  New York, New York
        May 17, 2021

                                    Respectfully submitted,

                                    AUDREY STRAUSS
                                    United States Attorney
                                    for the Southern District of New York

                         By:     _____/s/_____
                                    Andrew K. Chan / Adam Hobson
                                    Assistant United States Attorneys
                                    Tel.:  (212) 637-1072 / 2484

24