UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

– against –

LUIS MERCED,
WILLIAM SKINNER, and
DORIAN BROOKS,

                Defendants.

**OPINION & ORDER**

19 Cr. 0832 (ER)

Ramos, D.J.:

      Defendants Luis Merced, William Skinner, and Dorian Brooks are charged with a murder in aid of drug trafficking that took place in February 1989, in violation of Title 21, United States Code, Sections 848(e) and 2. In advance of trial, defendants Merced and Skinner move to compel the government to produce documents concerning prior investigations of the defendants by other law enforcement agencies. For the reasons discussed below, the motion is DENIED.

### I.    BACKGROUND

      The government alleges that defendants participated in a drug trafficking organization ("DTO") that distributed large quantities of crack and powder cocaine in the New York City and Washington D.C. metropolitan areas in the late 1980s and early 1990s, and that members of the DTO carried guns and committed numerous acts of violence in furtherance of the DTO's operations. Doc. 54 at 3. In particular, the government alleges that on February 10, 1989, defendants and other members of the DTO "hatched a plan to rob and murder Efren Cardenas, who was one of the DTO's suppliers of powder cocaine . . . ." (the "Cardenas Murder"). *Id.* According to the government, Cardenas was shot over 20 times on a public street in the Bedford-

Stuyvesant neighborhood in Brooklyn, while numerous bystanders watched. *Id.* The government alleges that, following the murder, the defendants split the proceeds of the robbery—alleged to be a package or briefcase containing large quantities of cocaine—with co-conspirators and fled to Washington D.C. *Id.*; Doc. 50-2; Doc. 50-3.

While the New York City Police Department ("NYPD") and the Kings County District Attorney's Office investigated the Cardenas Murder in the late 1980s and early 1990s, the government alleges "no other law enforcement agencies . . . actively investigated the [murder] between 1989 and 2017." Doc. 54 at 5. However, the government acknowledges Brooks and Merced were investigated in connection with various crimes in the Washington D.C. area, and is also aware that law enforcement agencies in Washington D.C. occasionally conferred regarding investigations of the DTO with the NYPD and the Kings County District Attorney's Office. *Id.*

According to the government, in December 2017, a cooperating witness who had been arrested by the DEA in New York began meeting with prosecutors and investigators in the Southern District of New York ("SDNY"), and agents from the NYPD Cold Case Squad. *Id.* At that time, the government alleges, SDNY and the NYPD Cold Case Squad opened an investigation into the Cardenas Murder and obtained records from the NYPD and from the Kings County District Attorney's Office relating to the murder. *Id.* According to the government, investigators located and interviewed witnesses over the next two years, and, on November 19, 2019, thirty years after the Cardenas Murder, a grand jury sitting in the Southern District of New York returned an indictment charging the defendants with the crime. *Id.* at 6-7.

According to defendants, since November 2020, they have been engaged in communications with the government regarding the production of various documents that would support defendants' theory that the DTO was "thoroughly investigated by a New York State and

2

United States Government Joint Task Force" throughout the late 1980s and early 1990s. Def. Mot. at 2. Specifically, defendants contend that this joint task force included the Drug Enforcement Administration ("DEA"), the Department of Justice ("DOJ"), namely, several United States Attorneys' Offices, the Kings County District Attorney's Office, and the NYPD. *Id.* at 4, 6.

In support of their argument, defendants seek the production of documents relating to the debriefings of three of the government's trial witnesses: ▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* In particular, defendants seek to compel the production of proffer notes, DEA Form 6s, and other similar documents related to debriefings of the three witnesses that defendants argue "most likely occurred in the late 1980s and early 1990s." *Id.* at 1, 11. Defendants allege—based on communications with the government—that these witnesses previously cooperated with the joint state and federal task force for the purposes of investigating the DTO. *Id.* According to defendants, these documents are material to their defense, are within the possession, custody, or control of the prosecution team, and may be material to the Court's ruling on defendants' motion to dismiss the indictment for pre-indictment delay.[1] *Id.*

On December 16, 2020, in response to defendants' first request for the documents, the government wrote that it "didn't have anything to disclose along these lines . . . ." Def. Ex. B at 1. On January 18, 2021, defendants sent another request for the production of documents. Def. Mot. at 2. Specifically, defendants requested, among other documents,

- "Any information concerning when the federal government, in any district (including the District of Columbia, where, approximately 30 years ago, arrests were made of alleged drug trafficking co-conspirators), had any information that: (a) overt acts in the conspiracy occurred, (b) when such acts allegedly occurred,

---

[1] The Court issued an opinion on November 30, 2021, denying defendants' motion to dismiss on the basis of pre-indictment delay.

3

- or (c) that Messrs. Merced, Brooks, or Skinner were allegedly involved in such acts";
- "Any written documentation or other information which explains the King County District Attorney's Office decision not to prosecute Mr. Brooks or Mr. Merced in 1989";
- "Any written documentation or other information relating to a prior USAO decision not to prosecute any of the defendants at any point before the decision was made to seek the current indictment";
- "Any written documentation or other information that identifies when the federal government's investigation into the murder or drug conspiracy commenced; if that investigation ended or was abandoned prior to the indictment here, then identify when the federal government resumed its investigation into this murder or drug conspiracy; and, when each cooperating witness in this case began cooperating with the federal government regarding any criminal investigation of any offense."

Def. Ex. B at 4-5.

In response, on February 8, 2021, the government wrote that defendants were not entitled to the broad discovery materials requested. According to the government, defendants' requests "inappropriately treat the federal government (and state prosecutors in Brooklyn) as a monolithic whole" and "assume that the SDNY has possession of documents held by all other federal agencies, as well as state entities, that might have investigated members of the [DTO] over the past 30 years." Gov. Opp. at 3. In its February 8 letter, the government explained that the prosecution team involved in the instant case comprised AUSAs and agents within SDNY and detectives with the NYPD Cold Case Squad, and wrote that while it was generally aware that members of the DTO may have been investigated and charged with other crimes by other investigative agencies in the 1980s and 1990s, it was not aware of any other agencies that investigated the Cardenas Murder other than the Kings County District Attorney's Office and the NYPD. *Id.* at 7.

On March 19, 2021, defendants sent a renewed request for discovery related to the DTO and the Cardenas Murder. Def. Mot. at 3. In particular, defendants wrote that a review of

4

discovery led them to conclude that the charged DTO is "the same as . . . the so-called Bush/Davis DTO led by DEA cooperator ███████ and ███████, which operated in Brooklyn, New York and elsewhere during the time of Mr. Cardenas's murder in furtherance of a drug conspiracy." Def. Ex. B at 12. "Upon information and belief," defendants wrote, "a joint task force . . . and multiple other prosecuting agencies investigated this DTO in the late 1980s and early 1990s," and several prosecutions resulted, including prosecutions for drug-related offenses and murders. *Id.* Thus, defendants argued, the instant indictment is "only the latest chapter in an unfolding 30-year investigation of the Bush/Davis DTO, its membership, its drug trafficking, and its violent activities." *Id.* In other words, the Cardenas Murder "is not an isolated discrete act." *Id.* Indeed, "[f]ederal jurisdiction in this matter is based on the murder's relationship to a drug conspiracy." *Id.* However, according to defendants, "the government's discovery disclosures relate to information about the murder, but not about the drug conspiracy." *Id.* In light of this, defendants requested that the government promptly request the joint task force files on the Bush/Davis DTO and produce all discoverable material therein. *Id.* at 17.

In response, the government wrote that it anticipated that certain of its trial witnesses will testify that they previously cooperated with other U.S. Attorneys' Offices and/or state prosecutor's offices during the early 1990s in other investigations and prosecutions, including other members of the DTO, but that it has not obtained files relating to these witnesses' prior cooperation from the archives of other U.S. Attorneys' Offices and/or state prosecutors' materials, and that those materials are not in the possession of the prosecution team working on the instant case. Def. Ex. C at 2. Despite this, defendants argue, the government has transmitted discovery materials from the DEA's Washington Division case files, relating to the prior

5

cooperation of ▓▓▓▓▓▓▓, a government witness in this case, and other witnesses. Def. Mot. at 3-4.

In addition, the government takes issue with the suggestion, from the defendants' March 19 letter, that "the entire DEA, NYPD, and Kings County District Attorney's Office are part of the SDNY prosecution team and that the Government is therefore obligated to collect and review agency files from any investigation of any member of the Bush-Davis Gang at any time in history." Gov. Opp. at 3. The government argues it had no involvement in the prior investigation into the Bush-Davis Gang, nor did anyone from the New York Division of the DEA. *Id.*

In any event, the government explains that, in a good-faith effort to resolve the defendants' request, it contacted members of law enforcement outside its prosecution team to ascertain what relevant information about the defendants might exist. *Id.* at 3-4. Specifically, the government (1) asked the NYPD to search its databases for prior arrests involving Merced, Brooks, and Skinner; (2) asked the Kings County District Attorney's Office and the Queens County District Attorney's Office for files relating to certain murders that the defendants requested; (3) asked the DEA to search its databases for prior cases involving Merced, Brooks, and Skinner; and (4) asked the DEA to search its databases for cases involving Kevin Davis, the alleged leader of the Bush-Davis Gang. *Id.* at 4. According to the government, it has reviewed and produced all the relevant files identified in these searches, and did so on a rolling basis beginning in April 2021. *Id.* The government makes clear that none of the files acquired through this process contains any information about the Cardenas Murder. *Id.*

On November 17, 2021, defendants field the instant motion. According to defendants, after having made "every effort" to resolve the discovery dispute without Court intervention,

they believe it is "now clear that [the government] is fully aware of members of a Joint Task Force that included DEA, DOJ, and NYPD personnel having debriefed witnesses the government intends to call at trial . . . ," but "refuses to locate and produce documents regarding what its witnesses said at such debriefings." Def. Mot. at 4-5. Defendants move to compel those documents.

## II.     LEGAL STANDARD

The obligations of the government to disclose information in this case are governed by Federal Rule of Criminal Procedure 16, *Brady v. Maryland*, and *Giglio v. United States*. Under Rule 16, the government must produce documents that are in its possession and are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). Under *Brady*, the government must disclose favorable material evidence to a criminal defendant. *See Brady*, 373 U.S. 83, 86 (1963); *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004). Evidence is favorable if it is exculpatory or, under *Giglio*, if it could be used to impeach a key government witness. *See Giglio*, 405 U.S. 150, 154 (1972). The government's obligations under *Brady* encompass not only information that is admissible in its present form but also material information that could potentially lead to admissible evidence favorable to the defense. *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007). "This obligation is designed to serve the objectives of both fairness and accuracy in criminal prosecutions." *Rodriguez*, 496 F.3d at 225.

The government's duty to disclose extends to evidence "within the government's possession, custody or control." Fed. R. Crim. P. 16(a)(1)(E). The "prosecutor is presumed to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to [] others acting on the government's behalf in the case, including the police.'" *United States v. Avellino*, 136 F.3d 249,

7

255 (2d Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995)); *see also United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). However, such a duty to learn of favorable evidence is not limitless. *See United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) ("Clearly the government cannot be required to produce that which it does not control and never has possessed or inspected."). It does not encompass every agency and individual within the federal government. *Avellino*, 136 F.3d at 255 ("knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor"); *see also United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975) (holding that imputation is only proper when an agency can be considered "an arm of the prosecutor"). Imposing "an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Avellino*, 136 F.3d at 255 (quoting *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993), *aff'd*, 59 F.3d 353 (2d Cir. 1995)).

In the Second Circuit, whether the government's disclosure duty extends to evidence maintained by another federal agency depends on whether the agency is "an arm of the prosecutor" or "part of the 'prosecution team.'" *United States v. Meregildo*, 920 F. Supp. 2d 434, 440-41 (S.D.N.Y.) (quoting *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002)). The determination of whether an agency or individual is part of the prosecution team "depends on the level of interaction between the prosecutor and the agency or individual." *Meregildo*, 920 F. Supp. 2d at 441; *see also United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (holding that reports made by FBI agents in the course of investigations apparently unrelated to the defendants' prosecutions should not be imputed); *Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir.

1985) (holding that a prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor" but did extend to a police officer who was the investigating officer on the case). At the two clear extremes, "investigating case agents are part of the prosecution team but agents of a separate organization or sovereign who are uninvolved in the investigation are not." *Meregildo*, 920 F. Supp. 2d at 441.

Where the prosecution "conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012). Several factors are relevant in determining whether the prosecution conducted a "joint investigation." These factors are set out in *United States v. Middendorf*, and include whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D.N.Y 2018)); *see also United States v. Martoma*, 990 F. Supp. 2d 458, 461 (S.D.N.Y. 2014) (relying on the joint conduct of interviews, exchange of documents, coordination of deposition efforts, and communications regarding the status of fact-gathering to find a joint investigation).

### III.   DISCUSSION

Here, defendants and the government disagree as to the scope of the prosecution team. Defendants argue a joint state and federal task force investigated the charged DTO in the 1980s and 1990s and that, as a result, the prosecution team in this case includes the DEA, the NYPD,

the Kings County District Attorney's Office, and other United States Attorneys' Offices, including the United States Attorney's Office for the Eastern District of Virginia.  Def. Rep. at 1.  Defendants argue that the SDNY prosecutors and agents working on this case "stand on the shoulders of, and therefore are part of the same prosecution team as, a 30-plus-year-old state and federal Joint Task Force investigation into the DTO."  Def. Mot. at 9.

The government, on the other hand, argues the prosecution team in this case consists of prosecutors, agents, and detectives from the SDNY and the NYPD Cold Case Squad, and, therefore, maintains it has no obligation to obtain, review, and produce materials that various offices from other states and jurisdictions "might have collected in the course of separate investigations conducted more than three decades ago."  Gov. Opp. at 1, 11.  According to the government, these law enforcement bodies—including the "entire DEA . . . and the entire Department of Justice"—were "*not* involved in the SDNY investigation," and the prosecution team in this case is "not responsible for information from multiple prior, decades-old investigations that were conducted by *other* agencies," and "other sovereigns."  *Id.* at 6, 11.  In other words, the government writes, defendants ask that it collect, review, and make productions from "files that the prosecution team had no role in creating, has never had in its possession, has no control over producing, and does not intend to use in this case."  *Id.*  The government argues that its disclosure obligations do not extend to the files of other agencies simply because those agencies investigated and prosecuted some of the same individuals for different crimes more than 30 years ago.  *Id.*

In applying the factors set out in *Middendorf*, the Court concludes that no joint investigation took place between the various state and federal agencies that investigated the DTO in the 1980s and 1990s and the SDNY and NYPD teams that began investigating the Cardenas

10

Murder three decades later, and that the prosecution team in the instant case does not include the Kings County District Attorney's Office, the DEA, or other U.S. Attorneys' Offices.

### a. Kings County District Attorney's Office

In their motion, defendants allege that the Kings County District Attorney's Office was a member of the joint task force that investigated the DTO in the 1980s and 1990s. Def. Mot. at 6, 7. Specifically, defendants contend that the office participated "in an investigation into the drug conspiracy that is allegedly connected to [the Cardenas Murder], and, upon information and belief, afforded members of the DTO cooperation agreements." *Id.* at 6. Defendants' motion, however, does not specify how or when the office was involved in the task force, which of the government's witnesses—if any—it investigated, or what documents—if any—it might have relating to the investigation of the Cardenas Murder. In their reply, defendants allege for the first time that ▇▇▇▇▇ one of the government's witnesses, "cooperated with the Kings County District Attorney's Office in the past . . . ." Def. Rep. at 2. But, defendants note, "the government has not requested ▇▇▇'s files from the Kings County District Attorney's Office . . . despite evidence that he proffered in the past . . . ." *Id.*

In its opposition, the government argues the District Attorney's Office's only involvement in this case is that—at the SDNY's request—they retrieved and provided a copy of their 1989 case file for the Cardenas murder. Gov. Opp. at 7. According to the government, the District Attorney's Office was not involved in this case, and only provided these materials as a courtesy. *Id.* The government argues that the District Attorney's Office did not, in "acting in good faith to help SDNY respond to defense requests," join the prosecution team. *Id.*

11

There is no indication from the record that the King's County District Attorney's Office participated in the government's witness interviews, was involved in presenting the case to a grand jury, reviewed documents shared by the government, helped to shape prosecutorial strategy, or accompanied the prosecution to court proceedings. At most, the District Attorney's Office shared documents from their 1989 investigation of the Cardenas Murder with the government in response to defendants' discovery requests. Under *Middendorf*, this is not enough to demonstrate that the government and the King's County District Attorney's Office conducted a joint investigation, or that the District Attorney's Office is on the government's prosecution team. *Middendorf*, 2018 WL 3956494, at *5 (finding government and SEC did not conduct a joint investigation, even though they conducted joint interviews, as the SEC was not involved in the grand jury presentation, did not review documents gathered by the government or share the fruits of its investigation with the government, and did not participate in the overall development of prosecutorial strategy).

### b. The DEA

Defendants also allege that the DEA was a member of the joint task force that investigated the DTO in the 1980s and 1990s, and, specifically, that the DEA, like the King's County District Attorney's Office, participated in an investigation into the DTO that is allegedly connected to the Cardenas Murder, and afforded members of the DTO cooperation agreements. Def. Mot. at 6-7. Defendants allege that law enforcement officers, including the DEA, interviewed Merced about the DTO in the fall of 1991, as well as other alleged members of the DTO. *Id.* Defendants note in their reply that the government has already turned over materials from the DEA relating to government witness ▮▮▮▮▮▮▮ and his "historical cooperation," and that the government asked the DEA to search its databases for prior arrests involving Merced,

12

Brooks, and Skinner. Def. Rep. at 2, 2 n.2. But, defendants allege, the government did not ask the DEA to search its databases for prior arrests of ███████. *Id.* at 2 n.2.

According to the government, "the only members of the DEA who have had any involvement in the SDNY investigation are the members of the New York Division who made the initial narcotics arrest of the cooperating witness whose information ultimately prompted the SDNY's investigation of the Cardenas murder." Gov. Opp. at 8. The government explains those agents participated in the initial proffers of the witness, but had "no other substantial involvement in the investigation or prosecution from that point forward." *Id.* According to the government, after the initial proffer, the SDNY initiated its investigation, working with special agents from the SDNY U.S. Attorney's Office and detectives in the NYPD's Cold Case Squad. *Id.* Beyond this, the only other involvement DEA agents have had, according to the government, is in the transportation of incarcerated witnesses from prison to the SDNY to meet with prosecutors in advance of trial. *Id.* Under *Middendorf*, this involvement does not amount to participation in a joint investigation, and does not suggest the DEA is a member of the prosecution team: there is no indication that the DEA or its agents participated in witness interviews other than the initial interview with the cooperating witness, helped to present the case to the grand jury, exchanged documents with the government, helped to shape government strategy, or accompanied the prosecution to proceedings.

### a. United States Attorneys' Offices

Defendants also allege the DOJ was a member of the joint task force that investigated the DTO in the 1980s and 1990s, and that DOJ personnel participated in an investigation into the drug conspiracy allegedly connected to the Cardenas Murder, and offered members of the DTO cooperation agreements. Def. Mot. at 6. Defendants argue that "select United States Attorney's

13

Offices," including the United States Attorney's Office for the Eastern District of Virginia, were involved in the joint task force. Def. Rep. at 1. According to defendants, government witnesses ███████, ███████, ██████, and ████████ "have all proffered that they had cooperated . . . with both federal prosecutors and New York State prosecutors." *Id.* at 2. Specifically, defendants allege that ██████ was called at Merced's state trial in Maryland pursuant to a 1991 cooperation agreement with the Eastern District of Virginia. *Id.* at 2. As a result, defendants argue, the government must "at a very minimum" contact the United States Attorney's Office for the Eastern District of Virginia "to obtain any debriefing notes and details of [██████] sentencing reduction." *Id.*

Still, the government maintains that no U.S. Attorney's Office outside the SDNY is part of the prosecution team, even if offices such as the Eastern District of Virginia prosecuted members of the DTO for other crimes in the 1980s and 1990s. Gov. Opp. at 9. According to the government, the only U.S. Attorney's Office involved in the instant investigation is SDNY. Again, there is no indication that any other U.S. Attorney's Office participated in government witness interviews, presented the case to the grand jury, exchanged documents with the government, helped to shape government strategy, or accompanied the government to any of its court proceedings. As such, under the *Middendorf* factors, there is no suggestion here of a joint investigation among the prosecution and the DOJ and its various offices.

Because the King's County District Attorney's Office, the DEA, and the United States Attorneys' Offices are not included in the prosecution team in this case, and the government's duty to disclose extends only to evidence within the possession, custody, or control of the prosecution team, the government is not obligated to locate and produce materials from those offices.

14

## IV.     CONCLUSION

For the reasons set forth above, defendants' motion to compel is DENIED.

Dated:   December 6, 2021
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.